**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

CHRISTOPHER PICKETT,　　　　　　) 　　　CASE NO. 3:12-cv-0396
　　　　　　　　　　　　　　　　　)
　　　Plaintiff,　　　　　　　　　)
　　　　　　　　　　　　　　　　　)　　　MAGISTRATE JUDGE
　　　v.　　　　　　　　　　　　　)　　　NANCY A. VECCHIARELLI
　　　　　　　　　　　　　　　　　)
MICHAEL ASTRUE,　　　　　　　　　)
COMMISSIONER OF SOCIAL SECURITY, )　　　MEMORANDUM OF OPINION
　　　　　　　　　　　　　　　　　)　　　AND ORDER
　　　Defendant.　　　　　　　　　)

This case is before the magistrate judge by consent.  Plaintiff, Christopher Pickett

("Pickett"), challenges the final decision of the Commissioner of Social Security

("Commissioner") denying Pickett's application for a period of Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i).  This court

has jurisdiction pursuant to 42 U.S.C. § 405(g).  For the reasons given below, the court

**REVERSES** the decision of the Commissioner and **REMANDS** this case to the ALJ to

(1) re-assess Pickett's RFC with respect to Dr. Keppler's statements regarding Pickett's

manipulative limitations and Dr. Richetta's statements regarding Pickett's mental

limitations, as described in this opinion; (2) re-assess Pickett's credibility in light of this

opinion and, if necessary, (3) re-examine whether there are jobs existing in significant

numbers in the local, regional, or national economy that Pickett can perform.

I.  Procedural History

Pickett filed an application for DIB on March 15, 2005, alleging disability as of November 24, 2000 due to back problems, obesity, and depression.  On April 25, 2005, the Commissioner denied Pickett's application, and Pickett did not appeal that decision.

Pickett filed a second application for DIB on April 25, 2006, initially alleging a disability date of May 4, 2005 but later amended his application to allege a disability date of November 24, 2000.  Pickett's application was denied initially and upon reconsideration.  Pickett timely requested an administrative hearing.

Administrative Law Judge Dennis LeBlanc ("ALJ") held a hearing on April 20, 2009.  Pickett, represented by counsel, testified on his own behalf at the hearing.  A vocational expert, Ted Macy, also testified.  The ALJ issued a decision on June 9, 2009, in which he determined that Pickett was insured through December 31, 2005 and was not disabled from May 4, 2005 through December 31, 2005.  The ALJ also found that although Pickett was limited to performing less than sedentary work and could not perform any past relevant work, he was nevertheless capable of performing work existing in the national economy.  Pickett requested a review of the ALJ's decision by the Appeals Council.  On March 23, 2010, the Appeals Council accepted review, vacated the ALJ's decision, and remanded the case for further proceedings.  Among other things, the Appeals Council found that the ALJ had not considered whether Pickett's claim of disability between November 24, 2000 and May 3, 2005 should be reopened, failed to consider whether the doctrine of *res judicata* applied in Pickett's case for a period previously adjudicated, did not determine whether Pickett's obesity was a severe impairment, and failed to address the opinions of the state agency

2

medical consultant or indicate the weight which should be given to those opinions.

Upon remand, the ALJ held a second hearing on October 8, 2010.  Pickett, was represented by counsel at the hearing.  A vocational expert, Thomas Nimberger ("VE"), and a medical expert, Dr. Malcolm Brahms ("ME"), testified.  Pickett did not submit additional documentary evidence or testify at the hearing.  The ALJ issued a decision on November 24, 2010, in which he determined that Pickett is not disabled.  The ALJ also found that there was not good cause for reopening the issue of Pickett's disability between November 24, 2000 and May 3, 2005.  The ALJ declined to apply *res judicata* to the period from April 25, 2005 through December 31, 2005.[1]  Pickett requested a review of the ALJ's decision by the Appeals Council.  When the Appeals Council declined further review on December 22, 2011, the ALJ's decision became the final decision of the Commissioner.

Pickett filed an appeal to this court on February 17, 2012.  Pickett alleges that the ALJ erred by (1) failing to evaluate or mention opinions of a treating physician; (2) failing to give any reason for rejecting portions of the ME's opinion; (3) misstating the ME's testimony; (4) improperly evaluating Pickett's mental condition; (5) arbitrarily finding that Pickett was not fully credible, and (6) failing to consider whether Pickett's significant but

---

[1]  The Commissioner contends that the only period at issue in this case is the period from April 25, 2005 through December 31, 2005.  According to the Commissioner, the ALJ's most recent opinion declined to reopen the prior determination that Pickett had not been disabled from November 24, 2000 through April 25, 2005.  Thus, the Commissioner argues, that prior decision is afforded administrative finality, and the ALJ considered the issue of disability only within the period from April 25, 2005 through Pickett's last insured date.  Under this interpretation, when the ALJ declined to apply *res judicata*, he declined to apply *res judicata* to the period from April 25, 2005 through December 31, 2005.  While the record on this point is far from clear, plaintiff does not dispute or contest the Commissioner's contentions.

intermittent periods of inability to work amounted to a disability.  The Commissioner

denies that the ALJ erred.

## II.  Evidence

### A.    Personal and Vocational Evidence

Pickett was born on December 25, 1974 and was 31 years old on the date he

was last insured.  He has a GED and past relevant work as a delivery truck driver and

laborer/construction worker.

### B.    Medical Evidence

In May 2000, Pickett injured his back while lifting a box at work.  Tr. at 664-66.

When pain and weakness worsened, he sought treatment.  X-rays were negative, and a

course of physical therapy and medication proved only temporarily effective.  Pickett

again injured himself lifting a box in November 2000.  Tr. at 664, 662-63.  Afterward, he

reported radiating pain, numbness, and weakness that worsened after 5-10 minutes of

standing.  On July 24, 2001, Pickett underwent a decompressive laminectomy

Picket received an MRI with gadolinum enhancement on January 2, 2002.  Tr. at

370-71.  The space at L5-S1 showed mild degenerative disc space narrowing but no

herniation or significant canal or foraminal stenosis present.  Similarly, there was no

herniation or significant canal or foraminal stenosis at L-2-3 or at L3-4.  There was,

however, enhancing granulation tissue or scar surrounding the thecal sac and transiting

to L5 roots at L4-L5; at L3-L4 there was, again, enhancing granulation tissue or scar

surrounding the thecal sac, accompanied by slight central bulging of the disc without

direct root impingement.  The overall impression was post-operative changes at L3-L4

and L4-L5 with residual or recurrent central bulging of the disc at L3-L4, eccentric to the

4

left, without direct nerve root compression.

Pickett received blocks at his right sciatic nerve and right piriformis muscle on April 12, 2002.  Tr. at 349-51.  He also underwent epidural steroid injections at the right L4-L5 level on June 3, June 11, and June 17 of 2002.  Tr. at 337-38, 341-42, 345-46.  A discography on September 26, 2002, performed by Dr. Louis Keppler, revealed degenerative disc disease at L3-L4.  Tr. at 333-34

On January 16, 2003, Dr. Keppler performed a posterior lumbar interbody fusion on Pickett.  Tr. 316-17, 677-78.  Pickett tolerated the procedure well and was given a back brace to wear for three to four months.  Tr. at 312.  A lumbar myelography on March 8, 2002 showed bilateral spondylolysis with foraminal stenosis at L5-S1.  Tr. at 300.

A lumbar myelography on March 1, 2004 showed status post laminectomy and anterior and posterior fusions with postsurgical changes at the level of the fusion and very mild degenerative disc disease with mild posterior bulging of the disc at L3-L4.  Tr. at 308.  A CT scan, also performed on March 1, 2004, revealed a borderline central canal at L4-L5 and possible mild foraminal narrowing on the right.  Tr. at 310.  It also revealed a mild degenerated and bulging disc at L4-L5.

On March 6, 2004, Pickett was admitted to hospitalization.  Tr. at 352-55.  At the time of admission, Pickett was in a stupor, was selectively mute, and tested positive for marijuana.  Pickett stated that he was unemployed and receiving worker's compensation.  He admitted using marijuana, alcohol, and cigarettes at age 13 and admitted a single instance of cocaine use.  According to Pickett, he had a history of one admission for drug rehabilitation and a history of two DUIs and one arrest for disorderly

5

conduct.  The medical history noted two back surgeries and noted that he was then taking Trileptal, Allopurinol, methadone, Elavil, Klonopin, and Toprol.  He exhibited no motor or sensory defects.  Upon discharge on March 8, 2004, Pickett was reported to be alert and oriented, his memory grossly intact, his mood even, his speech clear, his behavior composed, his motor activity average, his thought processes relevant, and his attention and concentration fair.  Judgment was faulty.  He was diagnosed as suffering from a marijuana-related disorder/marijuana dependence with hypertension and chronic pain.

Psychologist Donald Jay Weinstein, Ph.D., saw Pickett on March 17, 2004 at the request of Pickett's worker's compensation case manager.  Tr. at 372-76.  Pickett said that he needed somebody to talk to, that he got "frustrated and aggravated over everything that has happened," and that the "workman's comp thing has sent [him] over the edge."  Tr. at 372.  He also stated that his back pain was "moderate, not severe pain" like he used to have.  Tr. at 373.  He reported that he could not do things with his children, had difficulty with sexual activity, had trouble fishing, and that he was generally more limited than he used to be.  Pickett said that as a result of his physical inactivity, he became depressed and paranoid, and he finally had a breakdown in the office of one of his physicians, Dr. Vernon Patterson.  He reported staying at home most of the day and going to physical therapy three times a week.  Pickett was oriented but depressed.  He reported sleeplessness and denied suicidal action.  According to Pickett, he was depressed most of the day, had markedly diminished interest or pleasure in all or almost all daily activities, had significant weight loss, experienced insomnia nearly every day, suffered psychomotor agitation or retardation nearly every day, suffered from fatigue or

6

loss of energy nearly every day, suffered from feelings of worthlessness or excessive guilt, had a diminished ability to think or concentrate, and had recurrent thoughts of death.  Dr. Weinstein commented, "Mr. Pickett is highly motivated to feel better and return to work.  He sees these as being directly related and intertwined."  Dr. Weinstein diagnosed a moderate to severe major depressive disorder, single episode.

Pickett participated in regular psychological therapy sessions with Raymond D. Richetta, Ph.D. from April 12, 2004 through May 22, 2006.  Tr. at 377-410, 745-49.  The sessions focused on cognitive restructuring, reassurance, and stress management, with occasional relaxation training.  Over time, Pickett reported improvements in mood and reductions in paranoid thought, although he had more difficulty managing his mood and cognition whenever he reduced his exercise level.  He had increasing problems with pain until February 2005, when he attended a week-long pain management clinic, began AA and NA sessions, and increased his exercise level.  Pickett did complain, however, of impairments in short-term memory and concentration.  In May 2005, Pickett reported using marijuana and alcohol, and he later discontinued AA sessions because he did not want to lie about his sobriety.  By March 2006, Pickett was no longer using marijuana, but he also said that his physical condition was worse than it was before his surgery in December 2005 and he was experiencing some depression.

Between January 31, 2005 and February 16, 2005, Pickett participated in 11 occupational therapy sessions devoted to therapeutic exercise, life management, and pain management.  Tr. at 575-613.  At the conclusion of the program, Pickett was found to have met the following goals:  perform self-care dressing and bathing without increased pain; demonstrate good understanding of positioning techniques, exercises to

7

decrease right and left upper extremity parasthesias; place ten one-pound cans on the third shelf of the upper kitchen cupboard without increased pain; get items in and out of a kitchen cupboard lower shelf without increased pain; perform sweeping, washing dishes, and laundry tasks demonstrating an understanding of body mechanics; taking out the trash by dragging 60 pounds for 100 feet without increased pain; push a 100 pound grocery cart 100 feet without increased pain; carry 20 pounds of groceries for 50 feet four times without increased pain; carry a full laundry basket weighing at least 12 pounds up three sets of five steps without increased pain; demonstrate good understanding of proper computer ergonomics for leisure and possible work; lift 30 pounds from waist to shoulder height for work and home tasks without increased pain; perform at least 40 minutes of varied leisure tasks without increased pain; perform yardcare gardening for 15 minutes without increased pain; and demonstrate good knowledge and competency of body mechanics in pushing, pulling, lifting, and carrying. Pickett was also able to mow for 10 minutes without increased pain. Pickett was rated has having made good progress in occupational therapy and having met all goals, with one exception.[2] The therapist recommended upon his discharge that Pickett continue an active lifestyle, return to work when ready, continue with an exercise program, and continue with leisure activities.

Dr. Patterson's notes of Pickett's visit on March 24, 2005 state that Pickett seemed to be managing pain well. Tr. at 555. Pickett reported increasing his activities at home, and his vocational rehabilitation counselor suggested a work conditioning

---

[2] Pickett did not pass the "timed up and go test," which the therapist attributed to a lack of effort.

program.  Dr. Patterson concurred with the suggestion.

On April 23, 2005, psychologist Marianne Collins, Ph.D., reviewed Pickett's file at the request of the Bureau of Disability Determination ("the Bureau") and completed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment reviewing Pickett's condition.  Tr. at 755-68.  According to Dr. Collins, Pickett suffered from a major depressive disorder.  He had moderate restrictions in his activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, and pace; moderate limitations in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; moderate limitations in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and had experienced one or two extended episodes of decompensation.  Dr. Collins noted that most of Pickett's depression was the result of his physical condition and his financial situation.  She also noted the following:

> Claimant's statements are partially consistent with the medical evidence.  He stated it takes him a long time to leave the house.  Yet claimant goes to a gym daily to try to loss [sic] weight.  He also attended NA/AA meeting [sic] because there was some concern he was addicted to Xanax.  He also fishes when he has the time.  He should be able to adapt to a work environment that is routine and predictable.

Tr. at 771.

On April 25, 2005, Walter Holbrook, M.D., completed a Physical Residual Capacity Assessment reviewing Pickett's condition at the request of the Bureau.  Tr. at 773-79.  Dr. Holbrook opined that Pickett could lift and/or carry 20 pounds occasionally,

9

lift and/or carry 10 pounds frequently, stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday, and was unlimited in his ability to push or pull.  He also stated that Pickett should only occasionally climb ramps or staris, kneel, or crouch and never climb ladders, ropes, or scaffolds.  Dr. Holbrook found no other functional limitations and opined that Pickett's statements were consistent with the record.

On May 11, 2005, Dr. Patterson reported that Pickett was attending truck driver and tractor-trailer driver school.  Tr. at 554.  Dr. Patterson approved of this with the caveat that Pickett was not to lift repetitively anything greater than 50 pounds.  On June 8, 2005, Pickett reported to Dr. Patterson that he was doing better.  Tr. at 553.  According to Pickett, he was doing more with less pain, although he still suffered stiffness and soreness in his lower back.  Pickett also reported being able to sit for prolonged periods with minimal increases in back pain.  Dr. Patterson found that Pickett had a greater range of motion in his lumbar spine and less pain on palpation, although there was still some pain with extension.  On August 10, 2005, Dr. Patterson reported that Pickett seemed to be doing much better, had good range of motion of his spine, and had significantly less muscle pain to palpation, although he still had some discomfort and stiffness.  Tr. at 551.

Pickett visited Dr. Wuu-Shung Chuang in September 2005.  Tr. at 529.  Pickett stated that he had been feeling stressed and experiencing tightness in his chest after his father died recently from a heart attack.  He also reported that he was smoking a pack of cigarettes a day.  Pickett said that he thought he might be going back to work soon, probably in October 2005, after having been on disability for eight years.  A

10

physical examination, including an EKG, produced normal results.  Dr. Chuang told Pickett that he needed to lose weight and stop smoking.

On September 29, 2005, Pickett visited Dr. Patterson.  Tr. at 486.  Pickett reported that he was continuing to improve on his strengthening program.  However, he also reported increasing sciatic pain and significant piriformis pain upon piriformis stretching.  Dr. Patterson noted that Pickett would see Dr. Keppler regarding possible sciatic nerve release surgery.

On October 17, 2005, Pickett told Dr. Keppler that his back was "really doing quite well," and that it was feeling the best that it had in some time.  Tr. at 362.  Dr. Keppler noted that x-rays revealed good healing of the L4-5 fusion.  Pickett did report significant buttock pain and pain in the area of the sciatic notch.  He was extremely tender to palpation in that area, and he stated that when he had tried to stretch in that area he aggravated his symptoms.  He was unable to tolerate sitting.  Dr. Keppler offered exploration and decompression of the sciatic nerve at the right hip, and Pickett agreed.

An examination on December 5, 2005 revealed Pickett's muscle strength to be 5 at all extremities.  Tr. at 466.

Dr. Keppler performed an exploration and decompression of the right sciatic nerve at the hip on December 13, 2005.  Tr. at 365, 513.  On a February 1, 2006 follow-up visit, Dr. Keppler advised activity and exercise and wrote a prescription for physical therapy.  Tr. at 485.

Pickett visited Dr. Keppler on March 30, 2006 and reported that he now had more problems standing than sitting.  Tr. at 484.  Dr. Keppler believed that this indicated

11

lumbar problems rather than sciatic trouble.  Gross motor responses were intact.  Dr. Keppler ordered an MRI.

An MRI of the lumbar spine on May 2, 2006 revealed mild anterolisthesis of L4 on L5; loss of height of the L3-L4 intervertebral disc with bi-lobed disc extrusion; mild flattening of the thecal sac with mild central canal stenosis and moderate bilateral neiral foraminal narrowing at L3-L4; mild degenerative changes of the L5-S1 intervertebral disc; and a very small paracentral protrusion of the L2-L3 intervertebral disc.  Tr. at 368-69.  Dr. Keppler recommended epidural blocks on June 8, 2006.  Tr. at 482.

On July 24, 2006, psychologist Ronald Smith, Ph.D., examined Pickett at the request of the Bureau.  Tr. at 411-14.  Pickett stated that he always had pain in his lower back and right hip.  According to Pickett, the pain was worse in the morning when he has been standing awhile, and he can not stand in lines for more than a minute or two before having to sit down.  Pickett admitted that he had occasional suicidal thoughts, but he would not act on them.  He had some sad feelings about his back and was always anxious around people, although he was all right in his own neighborhood or in familiar stores.  He admitted that he had up and down days.  He had no problems with temper.  According to Pickett, he was able to do such chores as cutting the grass with a riding mower and helping out around the house.  He used alcohol rarely, but he smoked two packs a day.  He also admitted that he "might take a hit now and then, but not very often."  Tr. at 413.  Dr. Smith found Pickett to be co-operative, pleasant, well-organized in his thinking, demonstrating appropriate affect, alert, and well-oriented.  Dr. Smith also noted that Pickett's ability to maintain attention and concentration appeared to be fairly good, except at times when he is experiencing more severe pain in his back.

He also opined that Pickett had a good ability to follow simple one- or two-step job instruction within physical limitations and a good ability to relate to the public, co-workers, and supervisors.  Dr. Smith diagnosed Pickett as suffering from a major depressive disorder, single episode, in full remission and assigned him a Global Assessment of Functioning ("GAF") of 60.[3]

Dr. Keppler administered two blocks in July and August 2006.  Tr. at 495-98. The first block helped, but the second made things worse.  Tr. at 494.  Pickett reported pain radiating from the hips to the front of both legs.  Dr. Keppler suspected that the L3-L4 space was responsible for the problems and considered a discogram to determine whether a fusion at L3-L4 was necessary.  On October 20, 2006, Dr. Patterson recommended a spinal fusion at the L3-L4 level.  Tr. at 478.

On August 26, 2006, psychologist Roseann Umana, Ph.D., reviewed Pickett's file at the request of the Bureau and completed a Psychiatric Review Technique assessing Pickett's condition.  Tr. at 418-30.  According to Dr. Umana, Pickett suffered from a major depressive disorder, single episode, in full remission.  Dr. Umana opined that Pickett had mild restrictions in his activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, and pace; and had not experienced any episodes of decompensation.  She noted that Pickett had a GAF of 60 and found that his symptoms had almost fully resolved.

On September 6, 2006, Anil Thakuria, M.D., reviewed Pickett's file at the request

---

[3]  A GAF of between 51 and 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).

of the Bureau and completed a Physical Residual Functional Capacity Assessment reviewing Pickett's condition.  Tr. at 432-39.  Dr. Thakuria opined that Pickett could lift and/or carry 20 pounds occasionally, lift and/or carry 10 pounds frequently, stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; was limited in his ability to push or pull in his lower extremities; and had to be able to periodically alternate sitting and standing to relieve pain or discomfort. According to Dr. Thakuria, Pickett could stand or sit for two or three hours at a stretch, then alternate position and, in that way, complete six hours sitting or standing in an eight-hour workday.  Dr, Thakuria also stated that Pickett should only occasionally crawl and never climb ladders, ropes, or scaffolds.  Dr. Thakuria found no other functional limitations.  He also opined that Pickett's assertion that he could only sit for a few minutes was inconsistent with his attendance at truck driver school and found Pickett to be, at best, only partially credible.

On November 21, 2006, Dr. Richetta completed a Medical Statement Concerning Depression for Social Security Disability Claim assessing Pickett's condition.  Tr. at 449-51.  According to Dr. Richetta, Pickett's depressive symptoms consisted of sleep disturbances and difficulty in concentrating or thinking.  Dr. Richetta opined that Pickett had mild restriction in his activities of daily living, mild difficulties in maintaining social functioning, and had experienced repeated episodes of deterioration or decompensation in work or work-like settings.  He also opined that Pickett was moderately impaired in his abilities to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal workday and

14

workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Dr. Richetta noted that he had not seen Pickett since May 22, 2006 and that Pickett had failed to show for eight of 14 scheduled visits in 2005.

C.    Hearing Testimony

Pickett testified at his first hearing on April 20, 2009 but did not testify at his later hearing on October 8, 2010.  At the first hearing, Pickett testified that he had tried to return to work driving a truck a few years earlier but that he had to quit after three days due to pain.  Tr. at 71-72.  He said that he lives with his 14-year old son and his girlfriend.  Tr. at 72.  According to Pickett, he tries to do as much walking and physical activity as he can, helps get his son off to school, and straightens up around the house. Tr. at 73-74.  He also testified that he watches about six or seven hours of television broken up into shorter periods of time, with some time spent sitting and some lying down.  Tr. at 74-75.  His housework includes washing dishes for up to 10 or 15 minutes at a time and gathering and folding clothes.  Tr. at 74.  He has to work for 10 or 15 minutes at a time because he can only stand for a short time, then must sit.  Tr. at 74. His son runs the vacuum and lifts the laundry.  Tr. at 71.  He sometimes drives to visit his girlfriend at work or visit his mother and he occasionally fishes.  Tr. at 75-76.  His back keeps him from working, since his depression is kept in line by medications.  Tr. at 77.  Pickett described his pain like an ache, as though his back were locked in a vise. Tr. at 77. Much of his pain has gone away, although he occasionally gets a shooting pain down his leg.  Tr. at 77.  The pain is worst first thing in the morning or after he has been standing for a long period of time.  Tr. at 78.  He has to bend carefully, cannot lift

15

more than 10 or 15 pounds, and must avoid repetitive lifting.  Tr. at 79.  Walking on a

flat surface does not bother his back, and he is able to walk for 15 to 20 minutes at a

time.  Tr. at 80-81.  His medications help, although they make him tired.  Tr. at 81.

At the second hearing, the ALJ limited the ME's testimony to the period from

November 2000 through December 2005.  Tr. at 40.  The ME summarized that portion

of the record.  Tr. at 40-42.  He then opined that Pickett did not meet or equal an

impairment listed at 20 CFR Part 404, Subpart P, Appendix 1 ("the Listing").  Tr. at 42-

43.  In particular, the ME found that Pickett did not meet Listing 1.04 because the period

of time for his surgery and recovery did not last at least 12 months.  Tr. at 43.  The ME

further opined that Pickett could perform light work,  with no repetitive lifting below waist

level; avoiding kneeling, stooping, and crawling; and avoiding stairs, ladders, and

scaffolds.  Tr. at 43-44.  When asked by the ALJ, the ME testified that he had taken

Pickett's obesity into account in determining his capabilities.  Tr. at 44.  He also testified

that although Pickett would be more limited in the post-surgery recovery periods, those

periods were limited.  Tr. at 46-47.  Finally, the ME opined that, with a sit/stand option,

Pickett could sit all day.  Tr. at 48-49.

The ALJ asked the VE to suppose an individual 31 years of age with a GED;

limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently; who

could stand or walk for about six hours in an eight-hour workday; sit for about six hours

in an eight-hour workday but needed to alternate positions at an interval of at least two

hours throughout the eight-hour workday; who could occasionally climb ramps and

stairs and occasionally stoop, kneel, crouch, and crawl; but who could not climb ladders,

ropes, or scaffolds and must avoid extreme cold and workplace hazards.  Tr. at 55.  The

16

ALJ then asked the VE if there was unskilled work in the national, regional, or local economy that such an individual could perform.  The VE testified that there were a number of such jobs, including small products or bench assembler, hand packager, and cashier.  Tr. at 55-56.  The VE also testified that these jobs could be performed by an individual who was additionally limited to simple and repetitive tasks.  Tr. at 56.

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. Second,  the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R.

17

§§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent his from doing his past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent his from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

## IV.  Summary of Commissioner's Decision

In determining that Pickett was not disabled, the ALJ made the following relevant findings:

1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2005.

2.  The claimant has not engaged in substantial gainful activity during the period from his alleged onset date through the date last insured of December 31, 2005.

3.  Through the date last insured, the claimant had the following severe impairments:  degenerative disc disease of the lumbar spine and obesity.

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work, meaning he can lift and carry 10 pounds frequently and 20 pounds occasionally.  He can sit, stand, and walk for six hours in an eight-hour workday.  He must be able to alternate sitting and standing positions every two hours during an eight-hour workday . . . [H]e cannot climb ladders, ropes, or scaffolds, be exposed to extreme cold, work around dangerous moving machinery, or at unprotected heights.  He can occasionally climb ramps and stairs, kneel, stoop, crouch, and crawl.

6.  Through the date last insured, the claimant was unable to perform any past relevant work.

7.  The claimant was born on December 25, 1974 and was 31 years old, which is

18

defined as a younger individual age 18-49, on the date last insured.

8.  The claimant has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

11.  The claimant was not under a disability, as defined in the Social Security Act, at any time from May 4, 2005, the alleged onset date, through December 31, 2005, the date last insured.

Tr. at 19-25.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

19

VI.  Analysis

Pickett alleges that the ALJ erred by (1) failing to evaluate or mention opinions of a treating physician; (2) failing to give any reason for rejecting portions of the ME's opinion; (3) misstating the ME's testimony; (4) improperly evaluating Pickett's mental condition; (5) arbitrarily finding that Pickett was not fully credible; and (6) failing to consider whether Pickett's significant but intermittent periods of inability to work amounted to a disability.  The Commissioner denies that the ALJ erred.

A.      *Whether the ALJ failed to evaluate or mention a treating physician's opinions*

Pickett contends that the ALJ erred because he failed to evaluate the opinions of Dr. Keppler, Pickett's orthopedic surgeon.  In particular, Pickett notes that in October 2005, Dr. Keppler found that Pickett's statement that he could not "tolerate sitting" was "consistent with piriformis syndrome," that Pickett's pain complaints and functional loss were "appropriate for his diagnosis," and that his ability to perform gross manipulation was affected.  Tr. at 361-62.[4]  Pickett argues that because of these errors, the ALJ's RFC finding and his credibility findings are not supported by substantial evidence.  The Commissioner replies that the ALJ properly considered Dr. Keppler's opinions.

The medical opinion of treating physicians should be given greater weight than those of physicians hired by the Commissioner.  *Lashley v. Secretary of Health and Human Servs.,* 708 F.2d 1048 (6th Cir. 1983).  Medical opinions are statements about

---

[4]  In addition, Pickett claims that the ALJ also failed to note Dr. Keppler's March 2006 finding, made shortly after Pickett's decompression surgery, that Pickett said that he has "more problems now when he stands than when he sits."  Tr. at 365.  As Pickett's report of increased back pain occurred after his last insured date, the ALJ did not err in failing to consider that report.

20

the nature and severity of a patient's impairments, including symptoms, diagnosis, prognosis, what a patient can still do despite impairments, and a patient's physical or mental restrictions.  20 C.F.R. § 404.1527(a)(2).  This is true, however, only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record.  20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 & n.7 (6th Cir. 1991); *Sizemore v. Secretary of Health and Human Services*, 865 F.2d 709, 711-12 (6th Cir. 1988).  Where there is insufficient objective data supporting the opinion and there is no explanation of a nexus between the conclusion of disability and physical findings, the factfinder may choose to disregard the treating physician's opinion.  *Landsaw v. Secretary of Health and Human Servs.,* 803 F.2d 211, 212 (6th Cir. 1986).  The factfinder must, however, articulate a reason for not according the opinions of a treating physician controlling weight.  *Shelman v. Heckler*, 821 F.2d 316 (6th Cir. 1987); *see also* 20 C.F.R. § 404.1527(d)(2) (2011) (requiring "good reasons" for the weight accorded to a treating source's opinion).

The opinions at issue are found in two documents, a letter of October 17, 2005 from Dr. Keppler to Dr. Patterson, and a form from the Bureau completed by Dr. Keppler sometime in May 2006.  Tr. at 360-62.  The October 17, 2005 letter reads in relevant part as follows:

> I saw Christopher Pickett in the office today.  He states that his back is really doing quite well.  He says his back is feeling the best it has in some time now. His x-rays demonstrate good healing of the L4-5 fusion and instrumentation remains intact. . . . He is not complaining of any back pain.
>
> He has significant buttock pain and pain centered in the area of the sciatic notch. He is exquisitely tender to palpation in this area.  He states that any time he has

21

tried to stretch, do some piriformis type stretching, it has aggravated his symptoms.

He would like to get back to his work as a truck driver but he cannot tolerate sitting.  All of this, I believe, is consistent with piriformis syndrome.  He has an allowed condition of sciatica and as such, I think it is appropriate to offer him exploration and decompression of the sciatic nerve at the right hip.

Tr. at 362.  The completed form from 2006 consisted of Dr. Keppler's responses to a series of questions.  It reads in relevant part as follows:

1.  Give the date and type of neurologic condition of event and describe evidence and extent of cerebral/cerebellar deficit, peripheral muscle weakness, spasticity, rigidity, tremor, proprioceptive deficit, sensory deficit, pathological reflexes and atrophy:

The patient exhibited painful antalgia with piriformis syndrome, until sciatic decompression was accomplished on 12/13/2005.  There was limited ROM, pain and limited sitting with difficulty standing and walking.  He exhibited weakness in the legs.

2.  Please describe gait:  Affected. . . .

The patient has completed therapy to eliminate the need for an ambulatory aid.  However he still requires therapy.  The therapy is supportive to assist him with functioning and strength.

3.  Please describe the ability to do fine and gross manipulations:

Ok for fine.

Gross manipulation is affected.  Physical therapy has helped, he is showing improvement. . . .

6.  How long have the above findings persisted despite therapy?

The symptoms date back to 2002 in our records.  There is a 2000 BWC injury.

7.  Is the intensity/persistence of symptoms and/or pain, described and mentioned in your report, something you customarily see in association with the degree of physical findings described?  __yes__  If not, please elaborate:

> The patient[']s pain [indeciperable] and functional loss are appropriate for his diagnosis.

Tr. at 361 (emphasis in the original).  Although Dr. Keppler's opinion was given after Pickett's last insured date, the doctor's response to the first question assesses Pickett's condition *prior to* Pickett's sciatic decompression.  In addition, over his description of Pickett's manipulative limitations, Dr. Keppler wrote, "See attached."  Tr. at 361. Attached was Dr. Keppler's letter of October 17, 2005, described above, describing Pickett's problems with piriformis syndrome.  Thus, Dr. Keppler seems to be indicating that Keppler's manipulative limitations are related to his piriformis syndrome, and they may or may not have been alleviated by Pickett's decompression surgery on December 13, 2005 and his eventual recovery.  Consequently, Dr. Keppler's May 2006 opinion is relevant to Pickett's condition while Pickett was still insured.

In his opinion, the ALJ wrote the following with regard to Dr. Keppler's treatment of Pickett:

> On October 15, 2005, [sic] the claimant's orthopedist noted the claimant stated his back was doing well, and that it felt the best in some time now.  X-ray demonstrated good healing of the L4-5 fusion and instrumentation remained intact.  He did not complain of back pain, instead complained of significant buttock pain in the sciatic notch area.  It was tender on examination.  It was determined that claimant had piriformis syndrome and surgery for decompression of the sciatic nerve was recommended. . . .
>
> As noted above, the claimant's disability insured status expired on December 31, 2005.  Thus, it can be concluded that the objective evidence establishes that while the claimant had a condition that would have produced pain through December 31, 2005, it was not of disabling severity.  Dr. Brahms testified that, generally, recovery times for his surgeries was six months' duration.
>
> Furthermore, the evidence establishes that from the alleged onset date of disability of May 4, 2005 through December 31, 2005, the claimant was looking for truck driving jobs.  In fact, in a patient note from Dr. Patterson dated May 11, 2005, he indicated that the claimant was anxious to return to work.

23

Tr. at 22-23.  The ALJ also noted Pickett's subsequent condition, complaints, and surgery on January 24, 2007.  Tr. at 23.  The ALJ did not mention Dr. Keppler's opinion with regard to the limiting effects of Pickett's piriformis syndrome in the latter part of 2005 or his opinion that Pickett's alleged symptoms were consistent with his condition.

The Commissioner responds that Drs. Holbrook and Thakuria found that Pickett had no manipulative deficits and that, therefore, any assertion that Pickett suffered from a manipulative deficit is against the weight of the evidence.  This argument is not well-taken, for several reasons.  First, Dr. Keppler was a treating physician, while neither Dr. Holbrook nor Thakuria examined Pickett, much less treated him.  Consequently, Dr. Keppler's opinion is entitled to controlling weight over the opinions of Drs. Holbrook and Thakuria unless the ALJ gives good reasons to the contrary.  The ALJ has not done so. Second, the opinion from Dr. Holbrook is from April 25, 2005, while the opinion of Dr. Thakuria is from September 6, 2006.  Dr. Keppler's opinion relates to the period during which Pickett suffered a recurrence of piriformis syndrome, *i.e.*, approximately the latter quarter of 2005.  Neither the opinion of Dr. Holbrook nor that of Dr. Thakuria is relevant to that period, except to bookend a seventeen-month period during which Pickett may have suffered manipulative deficits for some unspecified length of time.[5]

Because the ALJ failed to give the opinions of Pickett's treating physician, Dr. Keppler, regarding Pickett's manipulative limitations controlling weight and failed to give

---

[5]  The Commissioner remarks that "[i]t is noteworthy that Dr, Keppler never opines that Plaintiff was disabled withing the meaning of the Social Security Act . . . ." Defendant's Brief at. 16.  It is also noteworthy that whenever a physician *does* opine that a claimant is disabled within the meaning of the Act, the Commissioner asserts that such an opinion is reserved for the Commissioner.

good reasons for doing so, the case must be remanded to the Commissioner for a re-assessment of Pickett's RFC.

B.      *Whether the ALJ improperly rejected portions of the ME's opinion*

Pickett also alleges that the ALJ erred by failing to give any reason for rejecting portions of the ME's opinion.  In particular, Pickett argues that the ALJ erred by giving "significant weight" to the ME's testimony then failing to include in his decision or hypothetical question the ME's opinion that Pickett could not do any repetitive lifting below the waist or that Pickett should avoid stairs.  The Commissioner replies that the ALJ properly considered and used the ME's opinion.

Pickett assumes, without proving, that merely because the ALJ gives an ME's opinion "significant weight" that the ALJ is required either to accept every facet of that opinion or explain any variance from the opinion.  The regulations do not require this.  The regulations merely require that the ALJ explain the general weight given to the opinions of non-examining physicians, 20 C.F. R. § 404.1527(f)(2)(ii), and require that the opinion be supported by substantial evidence.  Thus, in asserting that the ALJ erred by failing to explain departures from the ME's opinion, Pickett charges the ALJ with an "error" that does not exist.  In this respect, Pickett's argument is not well-taken.

C.      *Whether the ALJ erred by misstating the ME's testimony*

Pickett also contends that substantial evidence does not support the ALJ's reliance on the ME's testimony because the ALJ misstated that testimony.  The ALJ stated that he gave significant weight to the testimony of the ME, then he characterized that testimony in relevant part as follows:

Dr. Brahms opined the claimant can do light work, meaning he can lift and carry

10 pounds frequently and 20 pounds occasionally.  He can sit, stand, and walk for six hours in an eight-hour workday.  He cannot perform repetitive lifting below waist level, and climb ladders, ropes, or scaffolds.  He can occasionally kneel, stoop, and crawl.  Dr. Brahms testified his opinion is consistent with the opinions of treating sources (Exs. 13F, p. 2, 37F) and the evidence as a whole.

Tr. at 23-24.

As Pickett notes, there are several problems with this statement.  First, Dr. Brahms never said that his opinions were consistent with those of treating sources.  Second, as Pickett notes, what Dr. Brahms did assert about the opinions of a treating physician regarding the functional limitations resulting from spinal problems contradicts the ALJ's decision rather than supporting it.  Dr. Brahms testified that, in cases of spinal problems, objective findings alone are not indicative of the patient's subjective condition and that "[w]ithout question" the treating physician is in the best position to have an opinion regarding the limitations of a person suffering from spinal problems.  Tr. at 52-53.  Since the ALJ found that Pickett had no manipulative limitations and Dr. Keppler said that he did, Dr. Brahms' assertion of the importance of the treating physicians's opinion with respect to limitations undermines the ALJ's opinion.  Third, the exhibits at 13F and 37F are opinions of state agency physicians, not those of treating physicians as Dr. Brahms implied.  Fourth, Dr. Brahms never said that his opinions were consistent with the opinions in exhibits 13F and 37F.  He said that he had no reason to agree or disagree with them.  Fifth, what Dr. Brahms *did* say about the opinions in exhibits 13F and 37F was plainly contradictory.  The opinions in the exhibits asserted that Pickett required a sit/stand option.  Dr. Brahms stated that there "no reason in the world why [Pickett] couldn't" sit all day, tr. at 49, then immediately afterward stated that he had no reason to agree or disagree with the opinions in the exhibits.

26

The ALJ's error regarding agreement between the opinions of the ME and those of Pickett's treating physician reinforced the ALJ's error in failing to note Dr. Keppler's opinion that Pickett had manipulative limitations.  The ALJ's misunderstanding of the ME's testimony permitted the ALJ to believe that the ME's opinion that Pickett had no functional limitations was also the opinion of the treating physician.  That was not so.  The ALJ's erroneous belief that Dr. Keppler and the ME agreed on this point undermines the ALJ's entire opinion.

Because the ALJ's error regarding agreement between the opinions of the ME and those of Pickett's treating physician reinforced  the ALJ's error in failing to consider the opinions of Dr. Keppler regarding Pickett's manipulative limitations, the ALJ must correct this error in re-assessing Pickett's RFC.

D.        *Whether the ALJ erred by improperly evaluating Pickett's mental condition*

Pickett contends that the ALJ also improperly evaluated Pickett's mental condition.  According to Pickett, the ALJ erroneously failed to find that Pickett had a severe mental impairment and failed to include Pickett's mental impairment in his assessment of Pickett's RFC.  The Commissioner denies that the ALJ erred.

Stage two of the disability assessment process is intended only to eliminate meritless claims.  *See Higgs v. Bowen*, 880 F.2d 860, 862-63 (6th Cir. 1988).  Whether an impairment is deemed "severe" at the second stage of consideration is of no practical significance as long as the ALJ properly considers the limiting effects of *all* impairments on RFC, including the limiting effects of "non-severe" impairments.  *See* 20 C.F.R. § 404.1545(e).

In the present case, the ALJ considered the opinions of psychologists Dr. Smith,

27

who examined Pickett at the request of the Bureau on July 24, 2006, and Dr. Richetta, who treated Pickett from April 12, 2004 through May 22, 2006.  Dr. Smith found that Pickett's ability to maintain attention and concentration was fairly good, except when his back pain was more severe, and that Pickett had a good ability to follow simple one- or two-step job instruction within physical limitations and a good ability to relate to the public, co-workers, and supervisors.  Dr. Smith diagnosed Pickett as suffering from a major depressive disorder, single episode, in full remission and assigned him a GAF of 60.  Dr. Richetta opined that Pickett had difficulty in concentrating or thinking, accompanied by mild restriction in his activities of daily living, mild difficulties in maintaining social functioning, and had experienced repeated episodes of deterioration or decompensation in work or work-like settings.  Dr. Richetta also opined that Pickett was moderately impaired in his abilities to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Dr. Richetta also noted that he had not seen Pickett since May 22, 2006.

The ALJ rejected Dr. Richetta's assessment in favor of Dr. Smith's, concluding, "Based on Dr. Smith's report, the claimant's impairment did not impose more than minimal limitations upon his ability to perform work-related activities, so this is non-severe by Social Security definition."  Tr. at 20.  In rejecting Dr. Richetta's assessment, the ALJ stated, that Dr. Richetta's assessment was "nearly one year after the date last

28

insured in this matter, and Dr. Smith's report is closer in time to the relevant period." Tr. at 20.

That was error. Dr. Richetta made clear in his report that he had not seen Pickett since May 22, 2006. As Dr. Smith examined Pickett on July 24, 2006, it was *Dr. Richetta's* assessment that described Pickett's condition closest in time to Pickett's last insured date. Thus, the ALJ's reasoning in rejecting the opinion of Pickett's treating physician with respect to Pickett's mental condition was faulty.

The ALJ's assessment of Pickett's mental condition was also erroneous in a second respect. The ALJ found that Pickett had experienced no episodes of decompensation of extended duration. The two state psychologists who opined on the matter contradicted one another regarding episodes of decompensation, with one opining that Pickett had suffered one to two extended episodes of decompensation, tr. at 765, and the other opining that Pickett had suffered no extended episodes of decompensation, tr. at 428. Dr. Richetta opined that Pickett had suffered repeated episodes of decompensation. The ALJ failed to explain why he chose the opinion of one state psychologist over another and, more importantly, over the opinion of Pickett's treating psychologist.

The errors described above minimized Pickett's psychological symptoms. As the ALJ was required to consider the impact of Pickett's psychological symptoms in assessing Pickett's RFC, that resulted in a faulty assessment of his RFC. This is not a matter which can be corrected by the court. The case, therefore, must be remanded to the Commission for a re-assessment of Pickett's RFC with respect to his mental limitations.

E.    *Whether the ALJ erred by arbitrarily finding that Pickett was not fully credible*

Pickett also contends that the ALJ was arbitrary in assessing Pickett's credibility. Pickett makes five arguments in support of this contention: (1) the ALJ performed essentially the same analysis is writing his first and second opinions but found that Pickett's functional capacity was less than sedentary in the first report and light in the second; (2) the ALJ did not consider the ME's testimony that Pickett's allegations of pain were consistent with his medical treatment and that Pickett would have good and bad days; (3) the surgeries before and after Pickett's last insured date corroborates disability; (4) the ALJ did not adequately evaluate the strong narcotic pain medications prescribed for Pickett in terms of the degree of pain they indicated or consider their side effects; and (5) the ALJ erroneously found that Pickett's activities were consistent with an ability to do light work.  The Commissioner denies that the ALJ erred.

Pickett's argument that the ALJ conducted two essentially identical analyses and reached fundamentally different conclusions is undercut by the testimony of the ME.  At the second hearing, the ME testified that Pickett had the ability to do light work, and the ALJ cited that opinion in determining that Pickett was capable of light work. The testimony of the ME was not available when the ALJ issued his first decision.  Thus, because differing evidence was available for the two decisions, there was no inconsistency in reach two differing conclusions in the two decisions.

Pickett's assertion that the ALJ did not fully consider the testimony of the ME is not supported by the record.  The ME, indeed, testified that the treatments and medications Pickett received were consistent with the degree of pain that Pickett alleged and testified that Pickett would have better and worse days with respect to his

30

pain symptoms.  Tr. at 51.  The ME also stated that pain is essentially subjective and that the same physical condition may affect patients differently.  The ME testified, nevertheless, that Pickett is capable of light work, and the ALJ cited that opinion in determining Pickett's RFC.  The ALJ was justified in concluding, therefore, that whatever treatments Pickett was receiving and despite having good and bad days, Pickett had the functional capacity for light work.  Pickett's argument is not well-taken.

Pickett does not explain how his surgeries require the conclusion that Pickett was disabled during the insured period.  To be considered disabled, a claimant must unable "to do any substantial gainful activity by reason of any medically determinable physical or mental impairment for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a).  That Pickett required surgery in July 2001, January 2003, and January 2007 does not, in itself, mean that Pickett had a medically determinable physical impairment for a continuous period of not less than 12 months between November 24, 2000 and December 31, 2005.  This is particularly true in light of the ME's testimony that recovery from such surgeries typicaly lasted about six months.  Pickett also cites his December 2005 surgery on his right sciatic nerve as evidence of disability.  This surgery, too, does not demonstrate an inability to work for twelve months.  The record does not show any symptoms resulting from his 2005 problems with piriformis pain until September 29, 2005, when Pickett visited Dr. Patterson.  Tr. at 486.  The ME testified that recovery from such surgery would last three or four weeks.  Tr. at 47.  Thus, at best, the record might support a claim that Pickett was unable to work as a result of piriformis pain between September 29, 2005 and January 13, 2006.  This is insufficient to establish disability.

31

Pickett's allegation that he received strong narcotic pain medications, including methadone and Vicodin, and that the ALJ erred in failing to consider this in assessing Pickett's RFC and credibility is not well-taken.  The record contains several self-reports by Pickett that he was taking methadone, one in March 2004, tr. at 352, and two in March 2006, tr. at 222 (repeated at 225) and 259.  There is no indication that he was taking methadone at any other time or any description of the side effects the drug was causing him.  Thus, if the ALJ erred in failing to consider Pickett's use of methadone, there is no reason to believe that the error affected the ALJ's opinion.  The record also supports Pickett's use of Vicodin from March 2006 until at least July 2006.  Tr. at 407, 408, 410, 482, 491, and 498.[6]  As this period is outside of the period at issue, however, it is not relevant to an assessment of Pickett's RFC or credibility at that time.

In addition, Pickett argues that the ALJ erred in finding that Pickett's activities of daily living proved that he could perform a range of light work.  Tr. at 21.  According to Pickett, his activities of daily living contradict such an assessment because they indicate an inability to do sustained work.  The Commissioner denies that Pickett's activities of daily living indicate an inability to do sustained work.

At the first hearing, Pickett testified that he tried to do as much walking and physical activity as he can, helped get his son off to school, and straightened up around the house.  Tr. at 73-74.  He also testified that he watched about six or seven hours of television broken up into shorter periods of time, with some time spent sitting and some lying down.  Tr. at 74-75.  His housework included washing dishes for up to 10 or 15

---

[6]  Pickett's citations to the record for support for his contention that he was taking methadone and Vicodin appear to be incorrect.

minutes and gathering and folding clothes.  Tr. at 74.  According to Pickett, he had to

work for 10 or 15 minutes at a time because he can only stand for a short time, then

must sit.  Tr. at 74.  His son ran the vacuum and lifted the laundry.  Tr. at 71.  He

sometimes drove to visit his girlfriend at work or visit his mother, and he occasionally

fished.  Tr. at 75-76.

In his decision, the ALJ included the following description of Pickett's activities of

daily living in assessing his RFC and credibility:

> The claimant's wide variety of daily activities is consistent with light work activity.
> The claimant testified that he helps with the laundry, wash [sic] dishes, drives,
> goes shopping, and occasionally visited his mother and his girlfriend where she
> works.  He also stated that he spends much time watching television.  He
> occasionally went fishing.  He testified he recently moved into an apartment but
> did not carry much.  His pain is aggravated by standing long periods, driving a
> vehicle, bending, and squatting.  He said he can lift 10-15 pounds.  He can walk
> for 15-20 minutes and his back starts to tighten.  Ascending or descending stairs
> bother [sic] his legs more than his back.  These activities are relatively consistent
> with at least an ability to engage in light work-related activity.  Hence, the
> claimant's allegations are not entirely credible.

Tr. at 23.[7]

The ALJ removed from his description of Pickett's testimony every qualifier

inconsistent with an ability to engage in light work.  Pickett testified that he helped

gather and fold clothes while his son lifted the laundry.  The ALJ reduced this to the

ambiguous "helps with the laundry."  Pickett repeatedly said that he could not work for

periods of more than 10 or 15 minutes.  The ALJ ignored this.  Pickett testified that he

had to watch television in short periods of time and keep changing his position from

sitting to lying down.  The ALJ's decision makes no mention of this.  In sum, the ALJ

---

[7]  Pickett mis-cites this passage as tr. at 21.

cherrypicked Pickett's testimony regarding his activities of daily living.

Light work "requires a good deal of walking or standing, or . . . it involves sitting most of the time . . . ." 20 C.F.T. § 404.1567(b).  Other portions of the record may support the ALJ's conclusion that Pickett is capable of light work.  Pickett's testimony regarding his activities of daily living does not.  As the ALJ's finding that Pickett was not entirely credible was based, in part, on the conclusion that Pickett's testimony regarding his activities of daily living contradicted his alleged limitations, the ALJ's assessment of Pickett's credibility was flawed.  The ALJ must re-assess Pickett's credibility.

F.     *Whether the ALJ erred by failing to consider whether Pickett's various periods when he was unable to work amounted to a period of disability*

Pickett's final contention regarding the ALJ's opinion is not entirely clear.  Pickett argues as follows:

> Episodic impairments that cause significant but intermittent periods of disability are disabling because the individual cannot sustain work.  Here, in the five-year period between the alleged onset date in November 2000 and the date last insured in December 2005, the claimant had to undergo three major surgeries (Tr. 304, 366, 365).  The ALJ adopted Dr. Brahms's opinion that the recovery times for each surgery was six months duration (Tr. 23, ¶ 2).  The ALJ did not evaluate whether the combined periods of disability from the related surgeries were disabling.  A duty of the unskilled occupations in this case is to be present, without 6-month medical absences.  In other words, the hypothetical question to the vocational expert was incomplete in yet another way.

Plaintiff's Brief at 11.

Pickett appears to be arguing that the ALJ should have considered whether various, intermittent periods in which Pickett was unable to work combined to form a total of twelve months' inability to work, thus qualifying Pickett as disabled.  If this is Pickett's argument, it is without merit.  As the court has already noted, to be considered disabled, a claimant must unable "to do any substantial gainful activity by reason of any

34

medically determinable physical or mental impairment for a *continuous* period of not less than 12 months." 20 C.F.R. § 404.1505(a) (emphasis added).  Various, intermittent periods of inability to work scattered through 2000 through 2005 cannot be combined to create a single, 12-month period of disability so as to qualify as "disabled" within the meaning of the Act.  Pickett's argument to the contrary is not well-taken.

VII.  Decision

For the reasons set forth above, the court **REVERSES** the opinion of the Commissioner and **REMANDS** this case to the ALJ to (1) re-assess Pickett's RFC with respect to Dr. Keppler's statements regarding Pickett's manipulative limitations and Dr. Richetta's statements regarding Pickett's mental limitations, as described in this opinion; (2) re-assess Pickett's credibility in light of this opinion and, if necessary, (3) re-examine whether there are jobs existing in significant numbers in the local, regional, or national economy that Pickett can perform.

**IT IS SO ORDERED.**


Date:  November 15, 2012          *s/ Nancy A. Vecchiarelli*
                                  Nancy A. Vecchiarelli
                                  U.S. Magistrate Judge

35